**Mikhail BABAYEV, Plaintiff,**

v.

**MEDTRONIC, INC., Defendant.**

10–CV–2038 (SLT)(VMS)

United States District Court,
E.D. New York.

Signed January 5, 2017

Filed January 6, 2017

Serhiy Hoshovskyy, Law Offices of Serhiy Hoshovskyy, New York, NY, for Plaintiff.

Bernard J. Garbutt, III, Alice Leslie McCarthy, Shaina Stahl, Morgan Lewis & Bockius, New York, NY, John P. Lavelle, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

TOWNES, United States District Judge:

Plaintiff Mikhail Babayev ("Plaintiff") brings this torts action against defendant Medtronic, Inc. ("Defendant" or "Medtronic"), seeking to recover damages for a hip fracture he allegedly sustained as a result of an electric shock he received following the implantation of a neurostimulator manufactured by Defendant. Defendant now moves for summary judgment, principally arguing that the Medical Device Amendments to the Food, Drug and Cosmetics Act preempts each of the five causes of action contained in Plaintiff's Amended Complaint. Plaintiff opposes the motion and cross-moves for spoliation sanctions, urging the Court to either strike Defendant's answer or draw an adverse inference that would permit the conclusion that Plaintiff has made out a prima facie case of products liability and negligence. For the reasons set forth below, Plaintiff's cross-motion for spoliation is denied and Defendant's motion for summary judgment is granted.

### BACKGROUND

The following facts are undisputed. Plaintiff, who emigrated from Uzbekistan in 1993 and is now in his mid–50s, was diagnosed with multiple sclerosis in 2000. (Defendant's Statement of Facts Pursuant to Local Rule 56.1 ("Defendant's 56.1 Statement"), ¶¶ 1–2; Plaintiff's Counter–Statement Pursuant to Local Rule 56.1 ("Plaintiff's 56.1 Counter–Statement"), ¶¶ 1–2; Deposition of Mikhail Babayev ("Babayev Deposition"), pp. 8–9). As a result of that condition, he suffered constant pain. (Defendant's 56.1 Statement, ¶ 2; Plaintiff's 56.1 Counter–Statement, ¶ 2). In 2005, one of Plaintiff's neurologists referred him to Dr. Isaac Kreizman, who specializes in pain management. (Babayev Deposition, pp. 37–39; Deposition of Isaac Kreizman ("Kreizman Deposition"), p. 59).

At first, Dr. Kreizman treated Plaintiff's lower back pain with epidural injections of steroids. (Babayev Deposition, pp. 38–39; Kreizman Deposition, p. 59). After a while, the injections became less effective in that

they provided relief for a shorter period. (Babayev Deposition, pp. 40, 45). In November 2006, Dr. Kreizman proposed trying a spinal cord stimulator to see if it would provide any relief. (Babayev Deposition, pp. 40–41; Kreizman Deposition, pp. 66–67). According to Plaintiff, either Dr. Kreizman or a representative of the stimulator's manufacturer who was in the office at the time, provided him with "CDs and some literature or materials" relating to the neurostimulation system which Dr. Kreizman proposed using. (Babayev Deposition, p. 42).

Although Plaintiff was unable to produce the materials he received from Dr. Kreizman, Plaintiff's counsel has provided the Court with promotional literature and technical manuals relating to the Medtronic Restore Rechargeable Neurostimulation System (the "System") which was used to treat Plaintiff. The Declaration of Serhiy Hoshovsky ("Hoshovsky Declaration") attaches a 36–page booklet entitled, "Test Stimulation System: Preparing For Your Screening Test" (hereafter, the "Booklet") as Exhibit D; a 90–page "Percutaneous Lead Implantation Guide" (hereafter, the "Guide") as Exhibit E; an 18–page "Implant Manual" for Model 3776, 3777, 3778, 3876, 3877, and 3878 Leads as Exhibit F; a 30–page document entitled "Medtronic Pain Therapy: Using neurostimulation for chronic pain," which purports to provide "Information for prescribes" (the "Prescriber's Booklet") as Exhibit G; a 155–page users manual for "Patient Programmer" Model 37742 (the "Manual") as Exhibit H, and an 84–page "Surgical Lead Implantation Guide" as Exhibit J.

The Hoshovsky Declaration does not indicate which, if any, of these six documents Plaintiff received. However, the Manual lists three documents which a patient "should receive during test stimulation." (Hoshovsky Declaration, Ex. H., p. 15). The Manual itself is one of those documents listed. (*Id.*). The Court notes that the Manual and the Booklet are the only two of the six documents which directly address patients. The other four documents are technical literature for clinicians.

### The System

The Court has reviewed all six documents in order to obtain a complete understanding of the System and its operation. The System is designed to send electrical pulses to the spinal cord area so as to block pain signals from reaching the brain. (*Id.*, Ex. D, p. 4). During a test of the device, the pulses are generated by an "external neurostimulator" or "ENS" that contains electronics and two AA alkaline batteries. (*Id.*, Ex. D, p. 22, Ex. H., p. 41). The pulses are transmitted through a "Lead," a thin, coated wire which has small metal electrodes at the tip. (*Id.*, Ex. H, p. 42). In cases where the Lead is not long enough, a thin, coated wire "Extension" is used. (*Id.*).

The System is designed so that the strength, duration and frequency of the pulses can be adjusted by the patient. (*Id.*, Ex. D, p. 15). These three parameters—which Medtronic calls amplitude, pulse width and rate—are controlled by use of a "Patient Programmer," a hand-held device which resembles a calculator in that it has several buttons and an LED display. (*Id*, pp. 13–15). There is a small internal antenna on the back of the device which permits the Patient Programmer to transmit the desired parameters to the ENS via telemetry. (*Id.*, Ex. H, p. 54).

During a trial of the System, the electrode-bearing end of one or two Leads is surgically implanted into the patient's epidural space—the area just outside the sac of fluid that surrounds the spinal cord. (*Id.*, Ex. E, pp. 20–28). This procedure is performed using a Touhy needle, a relatively large hypodermic needle with a

curved point. (*Id.*, p. 20). Once the needle is inserted into the epidural space, a Lead is passed through the needle and advanced to the desired location. (*Id.*, pp. 25–26). Fluoroscopy—"a type of medical imaging that shows a continuous X–ray image on a monitor, much like an X–ray movie" (http://www.fda.gov/Radiation–Emitting Products/RadiationEmittingProductsand Procedures/MedicalImaging/MedicalX–Rays/ucm115354.htm)—is used throughout the procedure to ensure the correct placement of the needle and the Lead. (Hoshovsky Declaration, Ex. E, pp. 20, 27).

After the Lead is placed as desired, the non-implanted end of the Lead is then placed in a "Snap–Lip Connector" (a "Connector"), a small box containing grooves into which the non-implanted end of a Lead fit. (*Id.*, p. 29). Once the Lead is positioned in a groove, the lid to the Connector is snapped shut and a cable emanating from the Connector is plugged into the ENS. (*Id.*). Once it is plugged in, the Connector connects the ENS with the Lead and permits the pulse generated by the ENS to be transmitted to the electrodes.

After the Lead(s) are implanted and the Connector is plugged into the ENS, the patient is awakened in the operating room so that a clinician can conduct "Intraoperative Test Stimulation." (*Id.*, pp. 33–35). The Guide provides a protocol for conducting this procedure. First, the clinician must "[e]nsure that the patient can provide immediate feedback." (*Id*, p. 34). To make this possible, the implantation must be performed under local anesthesia with sedation, which must be monitored "closely to maintain comfort and to ensure that the patient can understand and respond during intraoperative test stimulation." (*Id.*, p. 16).

Next, after attaching a Clinician Programmer to the ENS, the clinician increases the amplitude while "ask[ing] the patient closed ended questions to identify:

Perception threshold (the amplitude at which the patient first perceives paresthesia) [and] Discomfort threshold (the amplitude at which paresthesia is beyond the patient's tolerance or described as uncomfortable)." (*Id.*, p. 34), The clinician then adjusts the three parameters "until the pain area is covered and the patient has satisfactory paresthesia coverage." (*Id.*). If satisfactory paresthesia coverage is not attained, even after changing "electrode settings," the Lead(s) can be repositioned. (*Id.*). The Guide directs the clinician to "[r]ecord all settings and patient responses to stimulation in the patient's chart." (*Id.*, p, 35). In addition, the Guide directs the clinician to "[o]btain baseline fluoroscopy images to record the lead position" and to place the images in the patient's file. (*Id.*).

In boldface print contained in a highlighted text box labeled "CAUTION," the Guide warns that the patient may receive "uncomfortable or unexpected stimulation (jolting or shocking sensation)" if the amplitude is not decreased to zero volts before the ENS is turned on or before the Connector is plugged into the ENS. (*Id.*, p. 34). The Guide repeats this warning after an instruction which directs the clinician to turn off the ENS after the testing is complete. In a text box entitled "NOTE," the Guide states: "Decreasing the amplitude to 0.0 V before turning the ENS off may prevent possible uncomfortable or unexpected stimulation when the ENS is turned back on." (*Id.*, p. 35).

Similar warnings are contained in the Booklet, which is written for patients, not clinicians. On page 22 of the Booklet, under the heading "Replace the External Neurostimulator Batteries," are two italicized "Cautions." The second reads:

Before changing batteries, always decrease all amplitudes to the lowest settings, turn OFF the external neurostimulator and then disconnect the cable

from the external neurostimulator to prevent possible uncomfortable or unexpected stimulation when stimulation is turned ON. (*Id.,* Ex. D, p. 22).

Although the Booklet does not caution the patient about other possible causes of uncomfortable or unexpected stimulation, the Manual states that a "jolting or shocking sensation" may have several causes other than a failure to turn the amplitude to zero. First, the Manual notes that "strong sources" of electromagnetic interference ("EMI") can result in "[u]nexpected changes in stimulation, causing a momentary increase in stimulation or intermittent stimulation, which some patients have described as a jolting or shocking sensation." (*Id.,* pp. 24–25). While the Manual maintains that an "unexpected change in stimulation ... does not ... injure a patient directly," it acknowledges that "[i]n rare cases, as a result of the unexpected changes in stimulation, patients have fallen down and been injured." (*Id.,* p. 25). The Manual also acknowledges that certain "household items," such as cellular telephones, can create enough EMI to cause a "momentary increase in stimulation." (*Id.,* pp. 26, 136–37).

Second, the Manual states that "changes in posture ... can cause a perceived increase in stimulation, which some patients have described as uncomfortable stimulation (a jolting or shocking sensation)." (*Id.,* pp. 34–35). The Manual explains that some movements, such as leaning back, "may cause the lead to move closer to your spinal cord," which "can increase the sensation of stimulation." (*Id.,* p. 48). It lists various activities to avoid, including "reaching over your head," "turning from side to side," and "bending forward, backward, or from side to side." (*Id.,* p. 49). The Manual notes that sudden changes in stimulation from this cause "are most common during recovery." (*Id.,* p. 48).

Third, the Manual implies that patient error in operating the System can cause a jolting or shocking sensation. It notes that the clinician can create "groups" that provide stimulation to one or more pain sites, for use during certain activities. (*Id.,* p. 43). The Manual cautions that use of a group other than the one recommended for a particular activity "may result in uncomfortable or unexpected stimulation (jolting or shocking sensation) when stimulation is turned ON." (*Id.,* p. 73).

While these are the only potential causes of jolting or shocking listed in the Manual, the "Prescriber's Booklet" alludes to others. This document contains an "Adverse events summary," which includes "Changes in stimulation ... which has been described by some patients as uncomfortable stimulation (jolting or shocking sensation)." (*Id.,* Ex. G, p. 17). The Prescriber's Booklet states that changes in stimulation may be "related to cellular changes around the electrode(s), shifts in electrode position, loose electrical connections, [and] lead or extension fractures." (*Id.*).

### Plaintiff's Procedure

The parties do not agree on the details of what occurred before, during, and after the surgical procedure to implant Leads in Plaintiff's back. It is beyond dispute that the procedure took place on the morning of Friday, February 23, 2007. The parties agree that Dr. Kreizman and a Medtronic representative, Michael Baker, were both present in the operating room. (Defendant's 56.1 Statement, ¶¶ 20–21; Plaintiff's 56.1 Counter–Statement, ¶ 20–21). Although the parties may not agree on precisely who did what, there appears to be no doubt that Dr. Kreizman, assisted by Dr. Richard A. Gasalberti, implanted the Leads and that Baker "tested" or "adjusted" the System. (Defendant's 56.1 State-

ment, ¶¶ 20–23; Plaintiff's 56.1 Counter–Statement, ¶¶ 20–23).

By all accounts, Plaintiff himself connected the components while unattended in the recovery room. (Defendant's 56.1 Statement, ¶ 25; Plaintiff's 56.1 Counter–Statement, ¶ 25). When he did so, he received an electric shock so severe as to prompt Plaintiff to disconnect the System with his teeth. (*Id.*). Baker was alerted to the incident and returned to the recovery room, where he removed the ENS and Patient Programmer. (Plaintiff's 56.1 Counter–Statement, ¶ 25; Baker Deposition, p. 59). Although the now-dysfunctional Leads were still implanted in his back, Plaintiff opted to go home. (Defendant's 56.1 Statement, ¶ 25; Babayev Deposition, p. 62).

That evening, Plaintiff felt worse and returned to the hospital by ambulance or ambulette. (Defendant's 56.1 Statement, ¶ 26; Plaintiff's 56.1 Counter–Statement, ¶ 26; Babayev Deposition, pp. 62–63). Thereafter, Dr. Kreizman removed the Leads and Connector. (Defendant's 56.1 Statement, ¶ 27; Plaintiff's 56.1 Counter–Statement, ¶ 27). According to Plaintiff, he remained in the hospital in excruciating pain for over a week before a March 2, 2007, X–ray revealed a hip fracture. (Babayev Deposition, pp. 102–04; Amended Complaint, 124). Plaintiff was subsequently transferred to the Hospital for Special Surgery, where he underwent bilateral hip replacement surgery on March 4, 2007. (Amended Complaint, ¶ 25).

### Plaintiff's Legal Actions

At least initially, Plaintiff was uncertain as to the cause of his hip fracture. At first, Plaintiff attributed the fracture to medical malpractice during the implantation surgery. Sometime in 2007, plaintiff commenced a medical malpractice action against the hospital and Drs. Kreizman and Gasalberti in the Supreme Court of the State of New York, Kings County.

Plaintiff and both doctors were deposed in the course of that action: Plaintiff on March 10 and 26, 2009; Dr. Kreizman on February 12, 2010; and Dr. Gasalberti on February 23, 2010. Both Plaintiff and Defendant have submitted the transcripts of Dr. Kreizman's deposition and Plaintiff's March 10, 2007, deposition to the Court in connection with their motions. (Hoshovsky Declaration, Exs. A & B; Declaration of Shaina Stahl ("Stahl Declaration"), Exs. A & B). In addition, Defendant has submitted a transcript of Dr. Gasalberti's deposition (Stahl Declaration, Ex. C), and Plaintiff has submitted a transcript of his March 26, 2009, deposition. (Hoshovsky Declaration, Ex. A).

Although these depositions reflect that none of the participants recall the events surrounding the February 23, 2007, surgery precisely, there is some consensus as to what occurred in Plaintiff's case. According to Dr. Gasalberti, once a patient is identified as a candidate for a neurostimulator trial, a doctor generally provides the patient with pamphlets and a video to review. (Gasalberti Deposition, pp. 58–59). On a subsequent visit, the patient is introduced to a Medtronics representative, who can provide further information. (*Id.*, 59). If the patient agrees to the trial, the Medtronics representative educates the patient about the System both before and after the surgery. (*Id.*, 39, 57).

Although Dr. Gasalberti did not know whether this procedure was followed in Plaintiff's case, he testified that Dr. Kreizman generally follows this procedure. (*Id.*, pp. 59–60). This testimony is consistent with the recollections of both Plaintiff and Dr. Kreizman. Plaintiff recalled having at least two conversations regarding the neurostimulator with pain management specialists: first with a Dr. Mogliner and later with Dr. Kreizman. (Babayev Deposition, pp. 29, 32–33). Plaintiff recalled that Dr.

Mogliner described that the neurostimulator worked by emitting "electrical impulses," and provided him with "some disks and some magazines" regarding the device. (*Id.,* p. 33).

Plaintiff subsequently discussed the neurostimulator with Dr. Kreizman. He recalled that, at some point, he met a representative of the neurostimulator's manufacturer in the presence of Dr. Kreizman. (*Id.,* p. 42). At his deposition, Plaintiff could no longer recall the name of the manufacturer, but remembered receiving "CDs and some literature or materials" that were "the same" as what he had previously received from Dr. Mogliner. (*Id.,* p. 42). However, Plaintiff testified that he no longer had those items because his wife threw them out. (*Id.* p. 34).

Dr. Kreizman recalled that he first broached the possibility of a neurostimulator trial with Plaintiff during his office visit on November 1, 2006. (Kreizman Deposition, p. 66–67). Dr. Kreizman, who is fluent in both Russian and English, recalled describing the possible complications of the surgery, using whichever language Plaintiff "felt more comfortable with." (*Id.,* p. 68). Although the doctor could not recall precisely what complications he discussed, he stated that he "reviewed all of the complications that Medtronic provides ... as possible complications of the procedure." (*Id.,* pp. 69–70). According to Dr. Kreizman, the complications are also described in "education material from Medtronics," which is provided to prospective patients (*Id.,* pp. 52, 55).

Dr. Kreizman recalled that Plaintiff agreed to undergo the trial at an office appointment on November 9, 2006. (Kreizman Deposition, p. 72). There is no evidence to suggest that Plaintiff was ignorant of the possible complications at that time. To the contrary, Plaintiff testified that Dr. Kreizman and the representative "described everything, like the color." (Babayev Deposition, p. 44). In addition, Plaintiff testified that he spoke with another physiatrist, Dr. Fuzaylov, about the procedure, and that Dr. Fuzaylov thought it was a good idea. (*Id.,* pp. 44–45).

In their deposition testimony, Plaintiff and the doctors agreed with respect to some aspects of what took place on the day of the surgery. Everyone agreed that Plaintiff was under anesthesia at the beginning of the procedure. (Babayev Deposition, p. 60; Kreizman Deposition, p. 79; Gasalberti Deposition, pp. 17–18). Neither Dr. Kreizman nor Dr. Gasalberti was asked about the type of anesthesia that was used, though Dr. Gasalberti volunteered that he had "forgot[ten] which anesthesia the patient had." (Gasalberti Deposition, p. 18). Plaintiff recalled receiving "something" that made him tired (Babayev Deposition, pp. 55, 60), but expressed uncertainty as to what it was. At one point he testified, "I believe I had some ... local anesthesia," (*id.,* p. 91), then equivocated, stating "probably it was not local anesthesia." (*Id.*).

Regardless of the type of anesthesia used, everyone testified that Plaintiff was awakened from the surgery to participate in the testing of the System. Dr. Kreizman testified that the testing began as soon as Plaintiff was awake and able to speak. (Kreizman Deposition, p. 80). He specifically recalled that Baker conducted the testing in his presence, and that Plaintiff stated that "he felt good." (*id.,* 79–80).

Plaintiff testified that the first thing he remembered after surgery was "some person next to [him]," "doing some adjustments" with "some kind of equipment." (Babayev Deposition, p. 57). The person asked him about his condition, inquiring about how he felt and what he felt. (*Id.*). Plaintiff identified the person as a "technician" or "Representative," and thought that he was Michael Baker, the same tech-

nician or representative with whom he had spoken in Dr. Kreizman's office. (*Id.*, pp. 58–59, 118–19).

Dr. Gasalberti did not remember the "exact specifics" of the conversation that occurred after Plaintiff was awakened in the operating room. (Gasalberti Deposition, p. 31). However, the doctor testified that the patient is generally questioned regarding whether he is comfortable or in pain and whether the device is providing "good coverage." (*Id.*, pp. 19, 31). In addition, Gasalberti recalled that the patient's statements are "recorded," and there is "multiple imaging" to ensure that the Leads are in the right place. (*Id.*, p. 19).

After the surgery, Plaintiff was wheeled to the recovery room. According to both Dr. Kreizman and Plaintiff, Baker made further adjustments to the System there. (Kreizman Deposition, p. 81; Babayev Deposition, p. 59). Dr. Kreizman specifically recalled that Plaintiff "felt comfortable with the stimulation," and that he told Plaintiff he was "pleased that he responded well." (Kreizman Deposition, pp. 81–82). Plaintiff recalled Baker "was doing adjustments," while asking Plaintiff what he felt and on what side he felt the stimulation. (Babayev Deposition, pp. 59, 63). Although Plaintiff testified that Baker did not show him how to make those adjustments (*id.*, pp. 63–64), he also testified that Baker "showed [him] everything," including how to place the ENS into the pocket of a belt. (Babayev Deposition, p. 59).

The shocking incident occurred in the recovery room shortly after Baker left Plaintiff with instructions to get dressed and go home. (Babayev Deposition, p. 61). Plaintiff dressed with the help of his son and a home attendant. (*Id.*). Then, as instructed by Baker, he plugged the Connector into the ENS. (*Id.*, pp. 84, 87). According to Plaintiff, he received an electric shock as soon as he connected the System. (*Id.*, p. 92). The shock caused a "horrible spasm" that made him jump up for a "very short time." (*Id.*, pp. 61, 93). Plaintiff did not fall but immediately disconnected the System with his teeth. (*Id.*, pp. 123, 125–26).

Following the incident, the hospital staff attempted to locate Dr. Kreizman, but he had already left the hospital. (*Id.*, p. 84). They succeeded in reaching Baker, who returned to the recovery room. (*Id.*). According to Plaintiff, Baker took the "device and placed it in his pocket." (*Id.*, pp. 67, 84). After telling Plaintiff to follow up with Dr. Kreizman on Monday, Baker left the room. (*Id.*, pp. 67, 84–85).

Although Plaintiff described his condition as "very bad," he was sent home in a wheelchair within hours after the incident. (*Id.*, pp. 65, 103). There, his condition worsened and he returned to the hospital that evening via ambulance or ambulette, allegedly screaming in pain. (*Id.*, pp. 63, 69, 103). Two or three hours later, Dr. Kreizman surgically removed the Leads. (*Id.*, p. 63).

Although the hip fracture was not discovered until more than a week thereafter, Plaintiff claims that he was told by a pain management doctor that a shock-induced spasm caused his hip fracture. (*Id.*, pp. 105, 123). However, Plaintiff could not recall the name of the doctor, (*id.*, p. 105), and has produced no medical records or admissible evidence to support this assertion.

### The Instant Action

On February 23, 2010, plaintiff Mikhail Babayev ("Plaintiff") commenced a torts action in the Supreme Court of the State of New York, Kings County, against Defendant. Although Plaintiff had already testified that he suffered the electric shock in the recovery room, and both Drs. Kreizman and Gasalberti had already testified that Plaintiff did not fall at any time during surgery (Kreizman Deposition, p. 102;

Gasalberti Deposition, p. 25), the complaint alleged that plaintiff sustained a fracture of his left hip while still "under anesthesia and during surgery." (Complaint, ¶ 6). The pleading alleged two causes of action: medical malpractice and ordinary negligence. Both causes of action relied primarily on the doctrine of *res ipsa liquitor*, noting that "a hip fracture is not ordinarily suffered during . . . surgery in the absence of . . . negligence." (*Id.*, ¶¶ 19, 25).

After the action was removed to this Court on diversity grounds, Defendant filed a pre-motion conference request, seeking permission to move to for summary judgment. (*See* Letter to Hon. Sandra L. Townes from John P. Lavelle, Jr., dated May 25, 2012). Although the complaint alleged only medical malpractice and negligence, Defendant construed the pleading as challenging "the design, manufacturing methods, testing, marketing, and labeling of the . . . System" and argued that such claims are preempted by the Medical Devices Amendments (the "MDA") to the Food, Drug, and Cosmetics Act (the "FDCA"). (*Id.*, p. 2). Plaintiff's response to the pre-motion conference request suggested theories of liability which were not specifically alleged in the complaint. (*See* Letter to Hon. Sandra L. Townes from Serhiy Hoshovsky, dated May 30, 2012).

At a pre-motion conference on May 16, 2013, the Court directed Plaintiff to file an amended complaint. That Amended Complaint, which was filed on June 28, 2013, changed the theory of the case. Instead of arguing that Plaintiff suffered the electric shock and sustained the fracture while under anesthesia during surgery, the amended pleading alleges that the shock occurred after the surgery, after Baker directed Plaintiff to get dressed and to connect the components of the System. (Amended Complaint, ¶¶ 14–16). Specifically, the Amended Complaint alleges that "[a]s soon as Mr. Babayev connected the components of the . . . System, he suffered severe electric shock and spasm that threw him up in the air causing excruciating pain." (*Id.*, ¶ 16).

Plaintiff's Amended Complaint raises five state-law causes of action: strict product liability, negligence, breach of the implied warranty of merchantability, breach of an unspecified express warranty, and failure to warn. The first cause of action is predicated on the assertion that the System was defective or adulterated, either because 1) the System as approved by the FDA was defective or 2) the components used in Plaintiff's case did not meet the premarket approval requirements or the Current Good Manufacturing Practices ("CGMPs") established by FDA regulation. The Amended Complaint, however, does not allege facts suggesting how that System was defective or adulterated.

Plaintiff's second cause of action appears to incorporate four different theories of negligence. First, it retains the reference to *res ipsa loquitor*, asserting that this doctrine is applicable because "a proximal femur fracture is not ordinarily suffered during lumbar surgery in the absence of negligence." (Amended Complaint, ¶ 67). The Court assumes that Plaintiff simply forgot to omit this theory, which is inconsistent with Plaintiff's own testimony that the incident occurred after, not during, the surgery.

Second, the second cause of action alleges that Defendant was negligent because it did not "properly design, manufacture, package, label, store, market, retail, distribute, supply, install, inspect, test, program, service, document proper installation, [or] maintain records . . . ." (Amended Complaint, ¶ 57). Third, it alleges that Defendant was negligent in failing to remedy defective conditions or installation techniques, and failing "to at-

tend to [P]laintiff's needs in a timely manner ....". (*Id.*, ¶ 63). The Amended Complaint does not allege facts with respect to either of these theories.

In contrast, the second cause of action does allege some facts in support of its fourth theory: that Defendant was negligent in violating CGMPs requiring that Defendant (1) "receive, review, evaluate and investigate [Plaintiff's] complaint and injuries" and (2) "properly install and test" its devices. (*Id.*, ¶¶ 58, 62). First, the pleading alleges that 21 C.F.R. § 820.198 requires "Medtronic to receive, review, evaluate and investigate complaints and injuries that resulted from its devices, such as the ... System." (*Id.*, ¶ 43). It alleges that Medtronic did not do so, noting that Medtronic did not file "the required Medical Device Report with the FDA until July 30, 2010, more than three years after the event." (*Id.*, ¶¶ 44–45).

Second, the Amended Complaint quotes 21 C.F.R. § 820.170, which provides, *inter alia*, that "[t]he person installing the device shall ensure that the installation, inspection, and any required testing are performed in accordance with the manufacturer's instructions and procedures and shall document the inspection and any test results to demonstrate proper installation." (*Id.*, ¶ 28). The pleading alleges that Defendant violated this CGMP in five respects. First, it alleges that general, rather than local, anesthesia was used during the installation of the System, and that the use of general anesthesia rendered Plaintiff unable to provide feedback during the intraoperative testing. (*Id.*, ¶¶ 30–35). Second, the Amended Complaint alleges that Plaintiff was not detoxified from narcotics prior to the testing of the System, making it impossible to properly assess the operation of the System. (*Id.*, ¶¶ 36–37). Third, the pleading alleges that Defendant failed to ascertain that the Leads were in the correct place and to

properly document the installation of the System by, *inter alia*, documenting the Lead positions that provided the appropriate stimulation and taking fluoroscopic images of the Lead positions. (*Id.*, ¶¶ 38–39). Fourth, the Amended Complaint alleges that Medtronic failed to ascertain that Plaintiff could properly operate the System. (*Id.*, ¶ 42). Fifth, the pleading alleges that Medtronic did not properly program the System in that Baker failed to reduce the amplitude to zero volts before telling Plaintiff to plug the Connector into the ENS. (*Id.*, ¶¶ 40–41).

The third and fourth causes of action assert a breach of the implied warranty of merchantability and breach of an express warranty, respectively. The third cause of action alleges that the System was unfit for its ordinary purpose in that it was "adulterated within the meaning of 21 U.S.C. § 351(h)." (*Id.*, ¶ 72). The fourth cause of action alleges that, since the System was "adulterated," Defendant breached an "express warranty for goods under New York UCC by representing that the ... System was designed, manufactured, packaged, labeled, stored, marketed, retailed, distributed, supplied, installed, tested, programmed and serviced within the specifications set forth in the PMA" and was "safe and effective for [its] intended purpose." (*Id.*, ¶ 75). However, neither cause of action alleges how the System was adulterated, other than to assert that "[n]umerous rules and regulations and Medtronic's own instructions were violated during the designing, manufacturing, packaging, labeling, storing, marketing, retailing, distributing, supplying, installing, testing, programming and servicing of the ... System ...." (*Id.*, ¶ 71).

The fifth and final cause of action alleges a failure to warn. This cause of action encompasses two different theories. First, the cause of action alleges that Defendant

knew or should have known 1) that the System was adulterated and 2) that numerous rules and regulations and Medtronic's own instructions were violated during the designing, manufacturing, packaging, labeling, storing, marketing, retailing, distributing, supplying, installing, testing, programming and servicing of the ... System," but failed to warn plaintiff of these facts. (*Id.*, ¶¶ 81–83). Second, the cause of action alleges that Defendant not only failed to provide warnings in a language Plaintiff could understand, but also failed to 1) "instruct, educate and provide necessary information with respect to ... operation of the ... System," or 2) "ascertain that Mr. Babayev could connect, use and operate the ... System." (*Id.*, ¶¶ 83–85).

### Defendant's Motion for Summary Judgment

Defendant now moves for summary judgment. Defendant principally argues that the System is a Class III medical device and that Plaintiff's state-law claims are preempted by the MDA's preemption provision, 21 U.S.C. § 360k. In support of this argument, Defendant has introduced evidence that the System is a Class III medical device and that the individual components of the System have received premarket approval. (Declaration of Chris Christiansen, dated June 20, 2014 (the "Christiansen Declaration"), ¶¶ 6, 9 & Ex. B). Defendant has also introduced evidence that the Leads and Connector specifically identified in Plaintiff's hospital records were manufactured, inspected, tested, packaged, and labeled in accordance with the premarket approval requirements. (Affidavit of Glenda Boodoosingh, dated June 23, 2014 (the "Boodoosingh Affidavit"), ¶¶ 5, 13–15 & Ex. D (Lead); Affidavit of James Millin, dated June 23, 2014 (the "Millin Affidavit"), ¶¶ 3, 13–15 & Ex. C (Connector)). Although Plaintiff's hospital records do not specifically identify the ENS or Programmer used in Plaintiff's

trial, Defendant has provided evidence that the ENS and Programmer assigned to Baker at the time of Plaintiff's surgery were also manufactured, inspected, tested, packaged, and labeled in accordance with the premarket approval requirements. (Affidavit of Lisa Montgomery, dated June 23, 2014 (the "Montgomery Affidavit"), ¶¶ 7–8, 16–19, Exs. K & L).

Defendant also advances three additional arguments. First, Defendant argues that Plaintiff has not introduced any evidence of an express warranty that would support his fourth cause of action. In connection with this argument, Defendant has introduced evidence that the Leads were packaged with an Express Limited Warranty which disclaimed, *inter alia*, the implied warranties of merchantability and fitness for a particular purpose. (Boodoosingh Affidavit, ¶ 19, Ex. G).

Second, Defendant argues that there is no evidence to support a claim against Medtronic's representative, Michael Baker. Defendant cites to portions of Dr. Kreizman's deposition testimony to establish that Dr. Kreizman and medical personnel made all of the decisions regarding surgery, and that Baker's only role was testing and programming the System. Defendant asserts that Plaintiff has no evidence "to establish a causal connection between any alleged actions of Mr. Baker and Mr. Babayev's alleged injury." (Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Defendant's Memo"), p. 24). Defendant notes that its literature, some of which is attached as Exhibits E, F, G, H and I to the Boodoosingh Affidavit, warns of "the very type of uncomfortable 'shocking' sensation" which Plaintiff experienced. (Defendant's Memo, p. 24).

Third, Defendant argues that Plaintiff's failure-to-warn claims are barred by the Learned Intermediary Doctrine. Defen-

dant principally argues that it discharged its duty to warn by providing adequate warnings to the physicians on the device's label. Defendant cites to the Prescriber's Booklet and the Implant Manual (attached to the Boodoosingh Affidavit as Exhibits E and F), which warn of the potential for patients to experience a "shocking" or "jolting" sensation. (Defendant's Memo, p. 24).

### Plaintiff's Response and Motion for Spoliation Sanctions

In his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross–Motion ("Plaintiff's Memo"), Plaintiff does not specifically address Defendant's arguments. Rather, Plaintiff's Memo starts by quoting to 21 C.F.R. § 820,170—the CGMP which requires that "[t]he person installing the device ... ensure that the installation, inspection, and any required testing are performed in accordance with the manufacturer's instructions and procedures and ... document the inspection and any test results to demonstrate proper installation." (Plaintiff's Memo, p. 4). Plaintiff's Memo then delineates the evidence which allegedly shows that Plaintiff's medical treatment departed from the procedures set forth in Medtronic's literature.

First, in support of his claim that he was given a general anesthetic, Plaintiff cites to portions of his deposition in which he states that he was given "something" that caused him to be unconscious during the surgery (Babayev Deposition, pp. 55, 57), and to Dr. Kreizman's testimony that Plaintiff was "put under anesthesia" at the start of the surgery, (Kreizman Deposition, p. 79). (Plaintiff's Memo, p. 5). However, Plaintiff also provides a copy of Dr. Kreizman's Operative Report which states that Plaintiff was only "sedated" by the anesthesiologist, and that "Lidocaine was injected at the L2 to L3 level to provide

local anesthesia." (Hoshovsky Declaration, Ex. I).

Notwithstanding this testimony, Plaintiff's Memo alleges that he was unable to provide feedback during the intraoperative testing. Plaintiff does not deny that he answered Baker's questions. Indeed, Plaintiff's Memo itself cites to that portion of Plaintiff's deposition testimony in which he stated that he awoke from surgery to find Baker "doing some adjustments" and asking, "how do I feel, what I feel." (Plaintiff's Memo, pp. 5–6 (quoting Babayev Deposition, p. 87)). Rather, Plaintiff's allegation that he was unable to provide feedback appears to be based solely on Plaintiff's representation that he was still feeling the effects of the sedation at the time he was getting dressed after the surgery. (Plaintiff's Memo, p. 7 (citing Babayev Deposition, pp. 83–84)).

Plaintiff's Memo also claims that Baker "failed to decrease the amplitudes to 0.0V and failed to turn the neurostimulator OFF" before giving the ENS to Plaintiff and telling him to connect it. (Plaintiff's Memo, p. 8). However, the only evidence that Plaintiff offers to substantiate this assertion is his own deposition testimony in which he states that he received the electric shock after plugging the Connector into the ENS. (*Id.* (citing Babayev Deposition, p. 84)).

Plaintiff also relies solely on his own testimony to argue that he was not properly instructed on the operation of the System. Specifically, Plaintiff's Memo quotes excerpts from the following portion of Plaintiff's Deposition:

Q: When the representative was adjusting the stimulator before you felt the terrible pain, do you have an understanding of what kind of adjustments he was making, what he was doing?

A: It was some buttons, some machine. I don't remember. But he was doing

some adjustments. And each time he asked me what I feel and on what side I feel.

Q: Were you instructed on how to do these adjustments on your own.

A: No. He made all adjustments. (Babayev Deposition, pp. 63–64).

Plaintiff implies that this testimony substantiates his claim that he could not properly operate the System. (Plaintiff's Memo, pp. 8–9).

Finally, Plaintiff's Memo argues that Defendant failed to document proper installation of the System. Plaintiff cites to those portions of Defendant's manuals which require documentation of the Lead position and the settings used and the patient's responses during intraoperative testing. (Plaintiff's Memo, pp. 9–10). Plaintiff then asserts that Defendant "failed to document and demonstrate that the . . . System was properly connected, adjusted, tested, programmed, and installed." (*Id.,* p. 10). However, Plaintiff's Memo does not allege that Plaintiff specifically requested Plaintiff's medical records and that such records did not contain this information.

In addition to setting forth this evidence of alleged violations of 21 C.F.R. § 820,-170, Plaintiff's Memo asserts that Defendant violated 21 C.F.R. § 820,198, which relates to records of complaints, and 21 C.F.R. § 803.50—one of the Medical Device Reporting ("MDR") requirements triggered by information that a device "caused or contributed to a death of serious injury." (Plaintiff's Memo, pp. 10–11). Plaintiff notes that Medtronic did not report the February 23, 2007, incident to the FDA until April 21, 2010. (*Id.,* p. 12). However, Plaintiff's Memo offers no evidence as to when Plaintiff filed a complaint or when Defendant received information that Plaintiff was seriously injured. Rather, Plaintiff implies that these requirements were triggered when Baker was summoned to Plaintiff's bedside and informed

that something had gone "wrong" with the device. (Plaintiff's Memo, p. 10).

Plaintiff's Memo also alleges the violation of two other FDA regulations, neither of which is mentioned in his pleading: 21 C.F.R. § 820.60, which requires that a manufacturer "establish and maintain procedures for identifying product during all stages of receipt, production, distribution, and installation to prevent mixups," and 21 C.F.R. § 820.65, which requires a manufacturer to "establish and maintain procedures for identifying with a control number each unit, lot, or batch of finished devices and where appropriate components [to] facilitate corrective action." (Plaintiff's Memo, pp. 11–12). In support of his claim that these regulations were violated, Plaintiff cites to a portion of Baker's Deposition testimony in which Baker stated that he did not "remember the model number" of certain components used in Plaintiff's treatment. (Plaintiff's Memo, p. 11 (citing Deposition of Michael Baker (the "Baker Deposition," which is attached to the Hoshovsky Declaration as Ex. C), p. 18). Plaintiff acknowledges that Defendant subsequently provided records of the ENS and Programmer that were assigned to Baker on February 23, 2007, but claims these records are insufficient to establish that these components were used during Plaintiff's procedure. (Plaintiff's Memo, p. 11).

In the discussion section, Plaintiff's Memo argues that none of Plaintiff's claims are preempted. Plaintiff principally relies on *Gelber v. Stryker Corp.,* 788 F.Supp.2d 145, 159 (S.D.N.Y. 2011), which held that a "defective manufacturing claim based upon a violation of . . . CGMP requirement[s] is not preempted." (Plaintiff's Memo, pp. 16, 20). However, Plaintiff's Memo does not specifically identify any manufacturing defects with respect to the

System. Rather, it alludes to the CGMP violations alleged in the fact section.

In discussing the breach-of-warranty claims, Plaintiff reads that portion of the Booklet which discusses whether the implantation surgery will be painful as "specifically represent[ing] that the [implantation] ... will be performed under local anesthetic and ... would not 'hurt.'" (Plaintiff's Memo, p. 19). Plaintiff also implies that the portion of Defendant's Limited Warranty which states, "The components must be used in accordance with the labeling and instructions for use provided with the Components," can be read as making some sort of express promise to Plaintiff. (*Id.*, p. 20).

With respect to Defendant's argument that there is no evidence to support a claim against Baker, Plaintiff asserts Baker "actually installed the ... System." (*Id.*, p. 17). Plaintiff points out that Baker connected the components of the System, and "tested, programmed and adjusted the device." (*Id.*). In addition, Plaintiff claims, without further elaboration, that Baker's instruction to plug the Connector into the ENS was a "wrongful instruction." (*Id.*).

Plaintiff does not directly address Defendant's Learned Intermediary argument. Rather, Plaintiff elaborates on his failure-to-warn claim, asserting that Baker had a duty to warn Plaintiff that the System was "adulterated" and that the surgery was not being conducted in accordance with Medtronic's manuals. In particular, Plaintiff claims that Baker knew or should have known that the procedure was being performed under general anesthesia, should have warned Plaintiff that he would be unable to communicate during intraoperative testing, and should have warned Plaintiff that the amplitude was not adjusted to zero volts before leaving Plaintiff to plug the Connector into the System. (*Id.*, p. 18).

In addition to opposing Defendant's Motion for summary judgment, Plaintiff cross-moves for an order either "dismiss[ing] the answer filed by the defendant" or "draw[ing] an adverse inference that plaintiff has made out a prima facie case of product liability and negligence" as "a sanction for the spoliation of evidence." (*Id.*, pp. 14–15). Plaintiff argues that Defendant 1) failed to produce the Leads and Extensions for inspection; 2) violated 21 C.F.R. §§ 820.170(b), 820.65, 820.198 and 803.50 by failing to maintain documentation of proper installation and Medtronic's handling of Plaintiff's complaint; and 3) failed to produce the ENS and Programmer for inspection. However, Plaintiff does not specifically allege that he made demands for inspection or discovery requests pertaining to specific records, and that Defendant refused to comply. Rather, Plaintiff requests that this Court enter an order compelling Plaintiff to, among other things, a) "identify by model, model number and serial numbers" the ENS and Programmer and b) produce these items for inspection. (*Id.*, p. 13).

### Defendant's Response to Plaintiff's Cross–Motion

Evidence regarding Plaintiff's discovery requests has, however, been submitted to the Court in connection with Defendant's response to Plaintiff's cross-motion. Exhibit L to the Declaration of John P. Lavelle, Jr., dated Aug. 19, 2014 ("Lavelle Declaration II") indicates that in March 2012, Plaintiff requested production of 1) the Lead and Extension that was implanted in, then removed from, Plaintiff and 2) the "patient programmer/battery pack" that was used during Plaintiff's neurostimulation trial. In response to these requests, Defendant 1) stated that it had not been in possession of the Lead and Extension "at any time after the commencement of plaintiff's trial" (Lavelle Declaration II, Ex. L, p. 4), and 2) asserted that "programmer/Battery Pack" were "undefined and

ambiguous terms." (*Id.*, p. 5). Nonetheless, Defendant provided records relating to the Programmer and ENS which had been provided to Baker. (*Id.*, pp. 3–4).

## DISCUSSION

### Spoliation

■■■ Before addressing Defendant's motion for summary judgment, the Court will address Plaintiff's cross-motion to sanction Defendant for spoliation of evidence. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). "[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107–12 (2d Cir. 2001).

■■■ With respect to the first element, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). The Second Circuit has held that "a regulation may supply the duty to preserve records." *Byrnie*, 243 F.3d at 109. "For such a duty to attach, however, the party seeking the inference must be a member of

the general class of persons that the regulatory agency sought to protect in promulgating the rule." *Id.* For example, if "a party has violated an EEOC record-retention regulation, a violation of that regulation can amount to a breach of duty necessary to justify a spoliation inference in an employment discrimination action." *Id.* Conversely, "violation of a rule that records be retained for securities disclosure purposes would not create a duty to preserve covered records for use in a subsequent employment discrimination suit." *Id.*

■■■ In this case, there is no evidence that Defendant had any obligation to preserve the Leads or extensions at a time when the components were still in Defendant's possession. By all accounts, the Leads and Connector were removed by Dr. Kreizman within a day of their implantation and more than a week before the fracture was discovered. Defendant represents that it was not in possession of the Leads and Connector at any time after the implantation surgery began (Lavelle Declaration II, p. 4), and Plaintiff has offered no evidence to the contrary.

In contrast, there is evidence that the ENS and Programmer may have remained in Defendant's possession during the pendency of this action. During his February 6, 2012, deposition, Baker testified that he repossessed the ENS and Programmer shortly after the incident. (Baker Deposition, p, 59). He further testified that he returned the ENS "to inventory" and that the Programmer is "with Medtronic somewhere." (Baker Deposition, pp. 59–60). Defendant provided Plaintiff with records on April 25, 2012, which specifically identified the Programmer and ENS that had been assigned to Baker at the time of the implantation surgery, but there is no record that Plaintiff made any request for inspection of those components or moved to compel inspection. Indeed,

Plaintiff's Memo requests that this Court enter an order compelling Plaintiff to, among other things, a) "identify by model, model number and serial numbers" the ENS and Programmer and b) produce these items for inspection. (Plaintiff's Memo, p. 13). This motion to compel could, and should have been made, during the course of discovery.

To the extent that Plaintiff is arguing that spoliation sanctions are appropriate for violation of 21 C.F.R. §§ 820,170(b), 820.65, 820,198 and/or 803.50, that argument is without merit. First, 21 C.F.R. § 820,170(b) requires that "[t]he person installing the device"—not the manufacturer—document proper installation. While 21 C.F.R. § 820.65 does impose a duty on manufacturers—namely, to "establish and maintain procedures for identifying with a control number each unit, lot, or batch of finished devices and where appropriate components"—there is no proof that Defendant breached that duty. Moreover, even if there were, § 820.65 specifically provides that this requirement is solely to "facilitate corrective action." Plaintiff does not cite to any authority for the proposition that this CGMP was designed to assist litigation, or that spoliation sanctions would be appropriate in cases in which a manufacturer failed to comply with § 820.65.

Plaintiff also offers no evidence that Defendant failed to comply with §§ 820,198 or 803.50. The former section creates certain requirements pertaining to the way in which manufacturers process and record complaints, while the latter contains certain reporting requirements which are triggered when a manufacturer "become[s] aware of information, from any source, that reasonably suggests that a device . . . [m]ay have caused or contributed to a death or serious injury . . . ." 21 C.F.R. § 803.50(a). Although Plaintiff has provided evidence that Medtronic did not report

the February 23, 2007, incident to the FDA until April 21, 2010 (*see* Hoshovsky Declaration, Ex. K), Plaintiff has offered no evidence as to when he filed a complaint or when Defendant received information that Plaintiff was seriously injured.

### Summary Judgment

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may [, *inter alia*] . . . consider the fact undisputed for purposes of the motion [or] . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

### The MDA

In arguing for summary judgment in this case, Defendant primarily argues that Plaintiff's claims are preempted by 21 U.S.C. § 360k, which was enacted as part of the MDA. Prior to enactment of the MDA in 1976, the FDCA did not require FDA approval for the introduction of new medical devices. Rather, "the introduction of new medical devices was left largely for

the States to supervise as they saw fit." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 315, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475–76, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)).

The MDA introduced a new "regime of detailed federal oversight" for medical devices. *Id.* at 316, 128 S.Ct. 999. This regime "established various levels of oversight for medical devices, depending on the risks they present." *Id.* "Class III devices 'presen[t] a potential unreasonable risk of illness or injury' and therefore incur the FDA's strictest regulation." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 343, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (quoting 21 U.S.C. § 360c(a)(1)(C)(ii)(II)).

New Class III devices are subjected to a "rigorous" premarket approval (or "PMA") process, in which "the manufacturer must provide the FDA with a 'reasonable assurance' that the device is both safe and effective." *Lohr*, 518 U.S. at 477, 116 S.Ct. 2240 (citing 21 U.S.C. § 360e(d)(2)). As of 1996, the FDA was spending "an average of 1,200 hours reviewing each application" for premarket approval, examining, *inter alia*, "the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device; samples or device components ...; and a specimen of the proposed labeling." *Riegel*, 552 U.S. at 318, 128 S.Ct. 999 (internal quotations and citations omitted). If a device receives premarket approval following this exhaustive examination, a manufacturer is forbidden "to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Riegel*, 552 U.S. at 319, 128 S.Ct. 999 (citing 21 U.S.C. § 360e(d)(6)(A)(I)). These FDA–approved design specifications, manufacturing processes, labels, etc., are sometimes called "PMA requirements."

Plaintiff does not dispute Defendant's evidence that the System is a Class III device, for which Medtronic has received supplemental premarket approval. (*See* Hoshovsky Declaration, Ex. M). Not all Class III devices on the market, however, have undergone the premarket approval process. The MDA contained a "grandfathering" provision, permitting those Class III devices which were on the market prior to the MDA's enactment to remain on the market without FDA approval until the FDA initiated and completed the premarket approval process. *Lohr*, 518 U.S. at 478, 116 S.Ct. 2240. To prevent these grandfathered devices from monpolizing the market, the MDA also permitted devices which are "substantially equivalent" to the grandfathered devices to avoid the premarket approval process. *Id.* The process of determining whether a device is "substantially equivalent" to a grandfathered device, which is known as "§ 510(k) process," is "by no means comparable to the PMA process," and is "completed in an average of only 20 hours." *Id.* at 478–79, 116 S.Ct. 2240.

*The MDA's Preemption Provision*

The MDA contains an express preemption provision, which is codified at 21 U.S.C. § 360k. Subsection (a) of this provision states:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

Subsection (b) permits the FDA to enact regulations exempting certain State and local requirements from preemption under subsection (a).

The Supreme Court has articulated a two-step test for determining whether a plaintiff's state-law claims relating to a medical device are preempted by this provision. First, a court "must determine whether the Federal Government has established requirements applicable to [the device at issue]." *Riegel,* 552 U.S. at 321, 128 S.Ct. 999. If so, the court "must then determine whether the [plaintiff's] common-law claims are based upon [state] requirements with respect to the device that are 'different from, or in addition to,' the federal ones, and that relate to safety and effectiveness." *Id.,* at 321–22, 128 S.Ct. 999 (quoting 21 U.S.C. § 360k(a)).

The Supreme Court has decided two cases relating to the scope of the MDA's preemption provision which provide guidance with respect to this two-step test. The first—*Medtronic, Inc. v. Lohr, supra*—involved a torts action to recover for injuries the plaintiff sustained because of defects in her pacemaker, a device which the FDA had approved pursuant to the § 510k process. The plaintiff advanced two causes of action. The first alleged that Medtronic was negligent in the design and manufacture of the pacemaker and in the failure to warn of known defects. The second sought to impose strict liability for the defective design and manufacture and the failure to warn. *See Lohr,* 518 U.S. at 481, 116 S.Ct. 2240.

After Medtronic removed the case to federal court, a district court granted Medtronic's motion to dismiss both claims on preemption grounds. The Eleventh Circuit reversed with respect to the design claims, rejecting "Medtronic's argument that the FDA's finding of 'substantial equivalence' had any significance with respect to the pacemaker's safety, or that the FDA's con-

tinued surveillance of the device constituted a federal 'requirement' that its design be maintained." *Id.,* 518 U.S. at 483, 116 S.Ct. 2240. It affirmed, however, with respect to the manufacture and failure to warn theories, finding that these theories "were pre-empted by FDA's general 'good manufacturing practices' regulations, which establish general requirements for most steps in every device's manufacture . . . and by the FDA labeling regulations, which require devices to bear various warnings." *Id.,* at 483–84, 116 S.Ct. 2240.

The Supreme Court affirmed in part and reversed in part, holding that none of Lohr's causes of action were preempted. First, the Supreme Court upheld the Eleventh Circuit's decision with respect to the design claims, holding that the § 510k process did not impose any federal "requirements" on the design of the pacemaker. *Lohr,* 518 U.S. at 492–94, 116 S.Ct. 2240. Quoting with approval that portion of the Eleventh Circuit's decision which noted that the "510(k) process is focused on *equivalence,* not safety," *id.* at 493, 116 S.Ct. 2240 (quoting *Lohr v. Medtronic, Inc.,* 56 F.3d 1335, 1348 (11th Cir. 1995)), the Court found that the design of the pacemaker, like "the design of pre–1976 and other 'substantially equivalent' devices," had "never been formally reviewed under the MDA for safety or efficacy." *Id.* The Court concluded that § 510(k) review "did not 'require' Medtronic's pacemaker to take any particular form for any particular reason [but] . . . simply allowed the pacemaker, as a device substantially equivalent to one that existed before 1976, to be marketed without running the gauntlet of the PMA process." *Id.* at 493–94, 116 S.Ct. 2240.

The *Lohr* Court reversed the Eleventh Circuit's decision with respect to the manufacturing and failure-to-warn claims. The Eleventh Circuit had opined that

these claims would interfere with the consistent application of general federal regulations governing the labeling and manufacture of all medical devices, including the "Good Manufacturing Practices" set forth in 21 C.F.R. § 820.1 *et seq.* However, the Supreme Court found that the federal labeling and manufacturing regulations identified by the Eleventh Circuit reflected "entirely generic concerns about device regulation generally, not the sort of concerns regarding a specific device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements." *Id.* at 501, 116 S.Ct. 2240. The Court stated:

> Although we do not believe that this statutory and regulatory language necessarily precludes 'general' federal requirements from ever pre-empting state requirements, or 'general' state requirements from ever being pre-empted, *see* Part VI, *infra,* it is impossible to ignore its overarching concern that pre-emption occur only where a particular state requirement threatens to interfere with a specific federal interest.... The statute and regulations, therefore, require a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and regulations. Such a comparison mandates a conclusion that the Lohrs' common-law claims are not pre-empted by the federal labeling and manufacturing requirements.

*Id.* at 500–01, 116 S.Ct. 2240.

A dozen years later, the Supreme Court revisited the MDA's preemption provision in *Riegel v. Medtronic, Inc., supra.* That case, unlike *Lohr,* involved a Class III device, the Evergreen Balloon Catheter, which had undergone the rigorous premarket approval process. The catheter ruptured during Mr. Riegel's coronary an-

gioplasty and Mr. and Mrs. Riegel subsequently filed a complaint in federal court, alleging that the device was designed, labeled, and manufactured in a manner that violated New York law.

The district court held that the MDA pre-empted Mr. Riegel's claims of strict liability, breach of implied warranty, and negligence relating to the design, testing, inspection, distribution, labeling, marketing, and sale of the catheter. In addition, the district court held that the MDA pre-empted a negligent manufacturing claim insofar as it was not premised on the theory that Medtronic violated federal law. On appeal, the Second Circuit affirmed, concluding that Medtronic was "clearly subject to the federal, device-specific requirement of adhering to the standards contained in its individual, federally approved" premarket approval application, *Riegel v. Medtronic, Inc.,* 451 F.3d 104, 118 (2d Cir. 2006), and that "the Riegels' claims for strict liability, breach of implied warranty, and negligent design, testing, inspection, distribution, labeling, marketing, and sale would, if successful, impose state requirements that differed from, or added to," the federal requirements. *Id.* at 121.

The Supreme Court affirmed the Second Circuit's ruling. With respect to the first step of the analysis, the Court found that premarket approval imposes federal, device-specific requirements. The Court contrasted the premarket approval process with the § 510(k) process, noting that it "focused on safety, not equivalence." *Riegel,* 552 U.S. at 323, 128 S.Ct. 999. The Court further noted that while § 510k review did not require a device to "take any particular form for any particular reason," premarket approval "forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other

attribute, that would affect safety or effectiveness." *Id.* at 319, 128 S.Ct. 999.

With respect to the second step of the analysis, the Supreme Court ruled that common-law causes of action for negligence and strict liability impose "requirements," as that term is used in section 360k. *Id.* at 323, 128 S.Ct. 999 (citing *Lohr*, 518 U.S. at 503–05, 512, 116 S.Ct. 2240). The Supreme Court recognized that state tort law, applied by juries under either a negligence or strict-liability standard, imposes duties on a manufacturer, just like state regulations. *See id.* at 324–25, 128 S.Ct. 999. Moreover, unlike regulations which "could at least be expected to apply cost-benefit analysis similar to that applied by the experts at the FDA," torts cases focus solely on the cost of a more dangerous design, without taking into consideration the counterveiling benefits of that design. *Id.*

*Riegel* does not hold, however, that *all* state products liability, negligence, and breach of warranty claims relating to a Class III device which has received premarket approval are preempted. Both *Riegel* and *Lohr* noted that the MDA does not preempt state-law claims when the common-law duties "parallel" federal claims. In *Lohr*, the majority noted:

> Nothing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements. Even if it may be necessary as a matter of Florida law to prove that those violations were the result of negligent conduct, or that they created an unreasonable hazard for users of the product, such additional elements of the state-law cause of action would make the state requirements narrower, not broader, than the federal requirement. While such a narrower requirement might be "different from" the federal rules in a literal sense, such a difference would

surely provide a strange reason for finding pre-emption of a state rule insofar as it duplicates the federal rule. The presence of a damages remedy does not amount to the additional or different "requirement" that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing "requirements" under federal law.

*Lohr*, 518 U.S. at 495, 116 S.Ct. 2240. Similarly, the *Riegel* Court noted that "§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties . . . 'parallel,' rather than add to, federal requirements." *Riegel*, 552 U.S. at 330, 128 S.Ct. 999.

### The Scope of the Parallel Claims Exception

The Supreme Court has not offered any guidance with respect to the contours of "parallel claims" since *Riegel*, and "[l]ower courts have struggled ever since when it comes to trying to decide whether particular state claims do or don't 'parallel' putative federal counterparts." *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1338 (10th Cir. 2015), *cert. denied*, —— U.S. ——, 136 S.Ct. 796, 193 L.Ed.2d 711 (2016). At least six Circuit Courts of Appeals have attempted to clarify this issue, but have promulgated standards which are at least somewhat—and sometimes very—different from one another. As a result, "[e]ven the usually straightforward job of laying out the rules governing . . . review is a real struggle in this area." *Id.* at 1340 (internal quotations and brackets omitted).

Some of the disagreement with respect to the scope of the parallel claims exception is attributable to different interpretations of *Buckman Co. v. Plaintiffs' Legal Committee*, *supra*, which addressed 21 U.S.C. § 337(a)—a statute which requires, with certain exceptions which are not ap-

plicable here, that "all... proceedings for the enforcement, or to restrain violations, of [the FDCA] ... shall be by and in the name of the United States." In *Buckman,* the Supreme Court held that "state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law." 531 U.S. at 348, 121 S.Ct. 1012. The Court reasoned:

[T]he federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and ... this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives. The balance sought by the Administration can be skewed by allowing fraud-on-the-FDA claims under state tort law.

*Id.*

Some courts, such as the Sixth and Eighth Circuits, "have adopted an expansive view of *Buckman* to impliedly preempt traditional state law tort claims premised on FDA violations." Jarett Sena, Note, *The Contours of the Parallel Claim Exception: The Supreme Court's Opportunity to Define the Ill–Defined,* 42 Fordham Urb. L.J. 291, 304 (2014). The Eighth Circuit subscribes to the view that there is only "a narrow gap through which a plaintiff's state-law claim must fit if it is to escape express or implied preemption." *In re Medtronic, Inc., Sprint Fidelis Leads Products Liab. Litig.,* 623 F.3d 1200, 1204 (8th Cir. 2010) (quoting *Riley v. Cordis Corp.,* 625 F.Supp.2d 769, 777 (D. Minn. 2009)). According to the Eighth Circuit, "plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted by § 360k(a)), but... must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman* ). *Id.* (quoting *Riley,* 625 F.Supp.2d at 777).

The Sixth Circuit has stated that, even though state tort suits premised on violations of federal law may be impliedly preempted by operation of 21 U.S.C. § 337(a), *see Buckman,* 531 U.S. at 348, 121 S.Ct. 1012, "[w]here the claim is based on traditional state-tort-law principles, the lack of a private cause of action within a federal regulatory scheme will not preempt the claim for damages (even if state regulations might be preempted)." *Fulgenzi v. PLIVA, Inc.,* 711 F.3d 578, 586 (6th Cir. 2013) (citation omitted). Thus, "[i]f... there are independent, pre-existing state law causes of action that parallel federal safety requirements, the suit is not preempted." *Id.* "But if the claims 'exist solely by virtue of' the regulatory scheme, they are preempted." *Id.* (citing *Buckman,* 531 U.S. at 353, 121 S.Ct. 1012).

Other courts, including the Fifth, Seventh, and Eleventh Circuits, "have limited *Buckman's* scope to fraud-on-the-FDA claims, thereby allowing traditional state law tort claims premised on FDA violations to avoid implied preemption." Sena, *supra,* 42 Fordham Urb. L.J. at 304. These courts have held that "state law claims that are based on federal regulations" are "parallel" claims. *Funk v. Stryker Corp.,* 631 F.3d 777, 779 (5th Cir. 2011); *see Kallal v. CIBA Vision Corp.,* 779 F.3d 443, 447 (7th Cir. 2015) (state tort claim is "parallel" to a federal one if it is a "remedy for claims premised on a violation of FDA regulations"); *Hughes v. Boston Scientific Corp.,* 631 F.3d 762, 774–76 (5th Cir. 2011) (holding that claims for failure to warn, premised on violation of FDA regulations, were not preempted); *Wolicki–Gables v. Arrow Int'l Inc.,* 634 F.3d 1296, 1301 (11th Cir. 2011) ("A plaintiff must allege that... defendant violated a particular federal specification referring to the device at issue" in order. to state a parallel claim.). Under this view, "section 360k protects a medical device manufacturer from liability to the extent that it has complied with federal law, but it does not extend protection from liability where the [state tort]

claim is based on a violation of federal law." *Bausch v. Stryker Corp.,* 630 F.3d 546, 552 (7th Cir. 2010).

The Tenth Circuit has adopted an entirely different approach. In its 2015 decision in *Caplinger v. Medtronic, Inc., supra,* the Tenth Circuit stated:

> [I]f we understand our directions, it seems we aren't supposed to ask whether Ms. Caplinger wishes to use state tort law to impose on Medtronic a safety requirement that is "different from, or in addition to" a federal requirement so much as whether she seeks to vindicate a state duty that is "narrower" or "broader" than a federal duty. To the extent the state law duty is narrower than or equal to the federal duty it survives, through what seems a sort of Venn diagram approach to preemption. Still, even if the state claim fails that test because it would impose a "broader" duty than can be found in federal law, it appears we may not find the claim preempted just because it conflicts with "any" federal requirement. Instead, we may find the state law claim preempted only if there exists a device-specific federal requirement, though this test admittedly finds no analogue when it comes to the state requirement clause interpreted in *Riegel.* Finally, should the state claim survive this far, we must ask whether it exists "solely by virtue" of the federal statutory scheme (unacceptable) or "predates" the scheme (acceptable).

*Id.* at 1340.

The Second Circuit is not among the Circuit Courts to have published an opinion relating to parallel claims. However, district courts in this Circuit have often adopted the approach favored by the Fifth, Seventh and Eleventh Circuits. *See, e.g., Rosen v. St. Jude Med., Inc.,* 41 F.Supp.3d 170, 177–78 (N.D.N.Y. 2014) (quoting *Bausch* and adopting the pleading standard set forth in *Bass v. Stryker Corp.,* 669 F.3d 501 (5th Cir. 2012)); *Simon v. Smith & Nephew, Inc.,* 990 F.Supp.2d 395, 402 (S.D.N.Y. 2013) (quoting *Bausch* and adopting the pleading standard set forth in *Wolicki–Gables* ); *Franzese v. St. Jude Med., Inc.,* No. 13–CV–3203 (JS)(WDW), 2014 WL 2863087, at *3 (E.D.N.Y. June 23, 2014) (quoting *Bausch* and adopting the pleading standard in *Simon* ). To be sure, district courts in this Circuit occasionally quote the "narrow gap" language from the Eighth Circuit's 2010 opinion in *In re Medtronic, Inc., Sprint Fidelis Leads Products Liab. Litig., supra. See, e.g., Pearsall v. Medtronics, Inc.,* 147 F.Supp.3d 188, 194 (E.D.N.Y. 2015); *Gale v. Smith & Nephew, Inc.,* 989 F.Supp.2d 243, 248 (S.D.N.Y. 2013); *Gelber,* 788 F.Supp.2d at 154. However, most of these courts also cite to, and apply, the Fifth, Seventh and Eleventh Circuit standards. *See Gale,* 989 F.Supp.2d at 248–49 (quoting *Bausch* for the proposition that § 360k "does not extend protection from liability where the claim is based on a violation of federal law" and quoting *Wolicki–Gables* for the proposition that, to "properly allege parallel claims, the complaint must "set forth facts pointing to specific PMA requirements that have been violated"); *see also Gelber,* 788 F.Supp.2d at 154–55. In light of the frequency with which district courts in this Circuit apply the Fifth, Seventh and Eleventh Circuits' approach, at least one court has concluded that "courts agree on [the] general standard" set forth in *Bausch*: that "section 360k protects a medical device manufacturer from liability to the extent that it has complied with federal law, but it does not extend protection from liability where the [state tort] claim is based on a violation of federal law." *Rosen,* 41 F.Supp.3d at 177–78 (brackets in original).

As discussed below in connection with Plaintiff's negligence claims, there is some

disagreement as to whether a plaintiff alleging a parallel claim "must point to a 'device-specific' violation—*i.e.* the PMAs—or if a plaintiff may rely on a more general violation of federal law." *Rosen,* 41 F.Supp.3d at 178 (citing *Gale,* 989 F.Supp.2d at 247–48). The district courts are in nearly complete agreement, however, on the degree of specificity required to plead a parallel claim. In light of the plausible pleading standards set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), district courts in this Circuit have repeatedly stated that a plaintiff cannot "simply incant the magic words '[defendants] violated FDA regulations' in order to avoid preemption." *Tansey v. Cochlear Ltd.,* No. 13–CV–4628 (SJF), 2014 WL 4829453, at *12 (E.D.N.Y. Sept. 26, 2014); *McConologue v. Smith & Nephew, Inc.,* 8 F.Supp.3d 93, 103–04 (D. Conn. 2014); *Gale,* 989 F.Supp.2d at 249; *Otis–Wisher v. Fletcher Allen Health Care, Inc.,* 951 F.Supp.2d 592, 598 (D. Vt. 2013), *aff'd sub nom. Otis–Wisher v. Medtronic, Inc.,* 616 Fed.Appx. 433 (2d Cir. 2015); *Desabio v. Howmedica Osteonics Corp.,* 817 F.Supp.2d 197, 204 (W.D.N.Y. 2011); *Gelber,* 788 F.Supp.2d at 155; *Horowitz v. Stryker Corp.,* 613 F.Supp.2d 271, 282 (E.D.N.Y. 2009). Many district courts have opined that in order "[t]o properly allege parallel claims, the complaint must set forth facts pointing to specific PMA requirements that have been violated." *Ortiz v. Allergan, Inc.,* No. 14 Civ. 8188 (PAC), 2015 WL 5178402, at *3 (S.D.N.Y. Sept. 4, 2015); *Desabio,* 817 F.Supp.2d at 204; *Gelber,* 788 F.Supp.2d at 155 (quoting *Wolicki–Gables,* 634 F.3d at 1302); *see Simon,* 990 F.Supp.2d at 403. The complaint must also "allege how the alleged violation is linked to plaintiff's injury." *Ortiz,* 2015 WL 5178402, at *3; *Gelber,* 788 F.Supp.2d at 155; *see Simon,* 990 F.Supp.2d at 403;

*Ilarraza v. Medtronic, Inc.,* 677 F.Supp.2d 582, 589 (E.D.N.Y. 2009).

### *Plaintiff's Strict Product Liability and Implied Warranty Claims*

■ To analyze Defendant's argument that Plaintiff's claims are preempted by § 360k, the Court employs the two-step analysis articulated in *Riegel.* Under this analysis, a court must first "determine whether the Federal Government has established requirements applicable to [the System]." *Riegel,* 552 U.S. at 321, 128 S.Ct. 999. If so, the court "must then determine whether the [Plaintiff's] common-law claims are based upon [state] requirements with respect to the device that are 'different from, or in addition to,' the federal ones, and that relate to safety and effectiveness." *Id.,* at 321–22, 128 S.Ct. 999 (quoting 21 U.S.C. § 360k(a)).

With respect to the first step, Plaintiff himself has introduced evidence that the System is a Class III device, and that the various components at issue herein received premarket approval in 2005. (*See* Hoshovsky Declaration, Ex. M). Premarket approval establishes federal requirements with respect to design specifications and manufacturing processes. *See Riegel,* 552 U.S. at 322–23, 128 S.Ct. 999. In addition, PMA requirements include "specific language for Class III device labels and warnings." *In re Medtronic, Inc., Sprint Fidelis Leads Products Liab. Litig.,* 623 F.3d at 1205.

Plaintiff's strict products liability, negligence, implied warranty, and failure-to-warn claims are predicated on the breach of various common-law duties. As the Supreme Court recognized in *Riegel,* these common-law duties constitute state-law "requirements" relating to safety and effectiveness, and are preempted by § 360k if they are "different from, or in addition to" the PMA requirements. Accordingly, to the extent that Plaintiff's Amended

Complaint alleges that the FDA–approved design, manufacturing process, packaging, labeling, installation, testing, or programming was defective, *see* Amended Complaint ¶¶ 48 & 57, those claims are preempted.

■ To the extent that Plaintiff's Amended Complaint is attempting to advance "parallel claims," Plaintiff's pleading fails to state such claims. In his first cause of action, alleging strict product liability, and his third cause of action, alleging breach of the implied warranty of merchantability, Plaintiff conclusorily alleges that the System and/or its components were defective or adulterated. However, the pleading does not allege plausible facts that even suggest the nature of the defect or adulteration.

Even if the pleading were adequate, Plaintiff has failed to introduce any evidence to establish any defect or adulteration. Rather, Plaintiff relies solely on his spoliation argument, urging the Court to find liability on that basis alone or to draw some sort of adverse inference with respect to the quality of the components. However, as explained on pp. 26–28, *ante*, Plaintiff has not established spoliation. Defendant, in contrast, has introduced evidence that the Leads and Connector specifically identified in Plaintiff's hospital records were manufactured, inspected, tested, packaged, and labeled in accordance with the premarket approval requirements (*see* Boodoosingh Affidavit, ¶¶ 5, 13–15 & Ex. D (Leads); Millin Affidavit, ¶¶ 3, 13–15 & Ex. C (Connector)), and that the ENS and Programmer assigned to Baker at the time of Plaintiff's surgery were also manufactured, inspected, tested, packaged, and labeled in accordance with the premarket approval requirements (*see* Montgomery Affidavit, ¶¶ 7–8, 16–19, Exs. K & L).

### *Plaintiff's Claim for Breach of Express Warranties*

■ Plaintiff's fourth cause of action, which purports to advance an express warranty claim, is actually another implied warranty claim. "New York's UCC provides for two forms of implied warranties—an implied warranty of merchantability under UCC § 2–314 and an implied warranty of fitness for a particular purpose under UCC § 2–315." *Kolle v. Mainship Corp.,* No. 04–CV–711 (TCP)(MLO), 2006 WL 1085067, at *3 (E.D.N.Y. Apr. 20, 2006). In alleging that Defendant violated the New York UCC by representing that the System was "safe and effective" for its "intended purpose," Amended Complaint, ¶ 75, the fourth cause of action appears to be alleging a violation of the implied warranty of fitness for a particular purpose. For the reasons set forth on p. 42, *ante*, this claim, like the implied warranty of merchantability claim raised in Plaintiff's third cause of action, is preempted.

■ To the extent that Plaintiff is truly attempting to advance a claim for breach of an express warranty, he has not only failed to allege any facts in support of that claim, but has also failed to adduce any evidence in support of it. "New York breach of express warranty claims require (i) a material statement amounting to a warranty; (ii) the buyer's reliance on this warranty as a basis for the contract with his immediate seller; (iii) the breach of this warranty; and (iv) injury to the buyer caused by the breach." *Avola v. Louisiana–Pacific Corp.,* 991 F.Supp.2d 381, 391 (E.D.N.Y. 2013) (citing *CBS Inc. v. Ziff–Davis Publ'g Co.,* 75 N.Y.2d 496, 502–504, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990)). Plaintiff has not alleged, much less established, any of these elements. To the contrary, Plaintiff himself has introduced a Limited Warranty which expressly disclaims the implied warranty of fitness for a

particular purpose. (*See* Hoshovsky Declaration, Ex. L).

### Negligence

█ Plaintiff's negligence claim is unique among the Amended Complaint's five causes of action in that it contains more than conclusory allegations. However, the negligence claim does not allege violations of device-specific premarket approval requirements. Rather, it alleges violations of CGMPs and MDRs.

"Medical devices in general, not just Class III devices, are subject to the ... CGMP requirements," which are set forth in 21 C.F.R. § 820.1 *et seq. Gelber*, 788 F.Supp.2d at 152. "These requirements set forth a quality control system and 'govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use.'" *Id.* (quoting 21 C.F.R. § 820.1(a)(1)). "However, the FDA recognizes that these requirements are intended to serve only as an umbrella quality system, providing general objectives medical-device manufacturers must seek to achieve." *Horowitz*, 613 F.Supp.2d at 278 (internal quotations and citations omitted); *see Ilarraza*, 677 F.Supp.2d at 588.

One of the CGMPs requires that a manufacturer "establish and maintain procedures for receiving, reviewing, and evaluating complaints." 21 C.F.R. § 820,198(a). These procedures must "ensure that: (1) All complaints are processed in a uniform and timely manner; (2) Oral complaints are documented upon receipt; and (3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to [the] FDA ...." *Id.* Under 21 C.F.R. § 180,-198(c), "[a]ny complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated,

unless such investigation has already been performed for a similar complaint and another investigation is not necessary." Under 21 C.F.R. § 820,198(d), "[a]ny complaint that represents an event which must be reported to [the] FDA ... shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified."

Another CGMP specifically relates to the installation and inspection of devices and reads as follows:

(a) Each manufacturer of a device requiring installation shall establish and maintain adequate installation and inspection instructions, and where appropriate test procedures. Instructions and procedures shall include directions for ensuring proper installation so that the device will perform as intended after installation. The manufacturer shall distribute the instructions and procedures with the device or otherwise make them available to the person(s) installing the device.

(b) The person installing the device shall ensure that the installation, inspection, and any required testing are performed in accordance with the manufacturer's instructions and procedures and shall document the inspection and any test results to demonstrate proper installation.

21 C.F.R. § 820.170.

Plaintiff's second cause of action asserts, *inter alia*, that Defendant was negligent in violating these two CGMPs. However, as noted on page 41, *ante*, there is some disagreement as to whether a plaintiff alleging a parallel claim "must point to a 'device-specific' violation—*i.e.* the PMAs—or if a plaintiff may rely on a more general violation of federal law," such as CGMPs. *Rosen*, 41 F.Supp.3d at 178 (citing *Gale*,

989 F.Supp.2d at 247–48). As one commentator has noted:

> [A] clear split has emerged. The Eighth Circuit held, in a consolidated litigation involving hundreds of claimants against the manufacturer of a defibrillator, that for a claim to survive preemption it must be based on a manufacturer's alleged deviation from a premarket approval, device-specific requirement. *See In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200 (8th Cir. 2010). In contrast, the Seventh Circuit held that claims based on violations of the FDA's industry-wide CGMPs survive preemption in *Bausch v. Stryker Corp.*, [630 F.3d 546, 555 (7th Cir. 2010)]. Less than a month later, the Fifth Circuit reached a similar holding with respect to parallel claims based on violations of the FDA's industry-wide reporting requirements in *Hughes v. Boston Scientific Corp.*, [631 F.3d 762, 771 (5th Cir. 2011)].

Elliot Sheppard Tarloff, Note, *Medical Devices and Preemption: A Defense of Parallel Claims Based on Violations of Non–Device Specific FDA Regulations*, 86 N.Y.U. L. Rev. 1196, 1200–01 (2011). The Fifth Circuit has subsequently elaborated on *Hughes*, holding that a plaintiff will have pleaded a parallel claim if the plaintiff "pleads that a manufacturer of a Class III medical device failed to comply with either the specific processes and procedures that were approved by the FDA or the CGMPs themselves and that this failure caused the injury." *Bass*, 669 F.3d at 512.

That same split of authority is reflected within this Circuit. Although the Second Circuit has not yet addressed the question, several district courts have. In a trio of cases, Judge Wexler has followed the Eighth Circuit and has categorically held that a parallel claim may not be predicated on alleged violations of CGMPs. *See Pearsall*, 147 F.Supp.3d at 197; *Burkett v.*

*Smith & Nephew GmbH*, No. CV 12–4895 (LDW)(ARL), 2014 WL 1315315, at *5 (E.D.N.Y. Mar. 31, 2014); *Ilarraza*, 677 F.Supp.2d at 588–89. Characterizing the CGMPs as "intentionally vague and open-ended" and "susceptible to an individual manufacturer's interpretation," Judge Wexler reasoned that the CGMPs "necessarily create potentially varying standards that would be 'different from, or in addition to' those required by the federal scheme, and are therefore preempted." *Pearsall*, 147 F.Supp.3d at 197 (citing *Ilarraza*, 677 F.Supp.2d at 588).

Other district courts in this Circuit have followed the Seventh Circuit and rejected Judge Wexler's categorical approach. For example, in *Gelber v. Stryker Corp., supra*, Judge Castel expressly adopted the Seventh Circuit's standard, which requires that a plaintiff show that state requirements and federal requirements be "genuinely equivalent," and holds that "[s]tate and federal requirements are not genuinely equivalent if a manufacturer could be held liable under the state law without having violated the federal law." *Id.*, at 155 (quoting *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005)). Judge Castel then held that 21 C.F.R. § 820.70—which requires that a manufacturer "establish and maintain procedures" to ensure that manufacturing material which could reasonably be expected to have an adverse effect on product quality "is removed or limited to an amount that does not adversely affect the device's quality"—created "no additional substantive requirement" but merely reinforced the manufacturer's obligations to comply with PMA requirements. *Gelber*, 788 F.Supp.2d at 156.

Cases like *Bass*, *Bausch* and *Gelber*, however, do not stand for the proposition that a violation of any CGMP can serve as the basis of a parallel claim. Those three cases all involved the Trident hip replace-

ment system, a prosthetic device which the FDA found in 2007 to be "adulterated" in the sense that it was manufactured in violation of federal standards. As Judge Castel noted in *Gelber*, New York law permits a plaintiff to prove a manufacturing flaw under either negligence or strict liability by showing "that a specific product unit was defective as a result of some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction, and that the defect was the cause of plaintiff's injury." *Gelber*, 788 F.Supp.2d at 155 (internal quotations and citations omitted). Accordingly, the plaintiff's New York tort claims based on a violation of a CGMP requirement obligating a manufacturer to establish and maintain procedures for weeding out material that could reasonably be expected to have an adverse impact on health would impose "no additional substantive requirement . . . on defendants." *Id.* at 156.

Similarly, the *Bausch* Court noted that "Illinois treats a violation of a statute or ordinance designed to protect human life or property as prima facie evidence of negligence, though the violation may not always be conclusive on the issue of negligence." *Bausch*, 630 F.3d at 553. The Seventh Circuit held that if the Illinois plaintiff in *Bausch* could prove negligence by establishing a violation of the federal law, "her claims under state law would not impose on defendants any requirement 'different from, or in addition to, any requirement' imposed by federal law" and would not be preempted. *Id.*, at 553. As the *Bass* Court explained in the context of a motion to dismiss:

> The key distinction between complaints that are sufficient to withstand a motion to dismiss and those that are not is not reliance on CGMPs, but rather the existence of a manufacturing defect caused by a violation of federal regulations and allegations connecting a defect in the manufacture of the specific device to

that plaintiff's specific injury. *See Wolicki–Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1301–02 (11th Cir. 2011) (affirming summary judgment but stating that a complaint is adequate if it "set[s] forth any specific problem, or failure to comply with any FDA regulation that can be linked to the injury alleged" (internal quotation marks omitted)); *In re Medtronic*, 623 F.3d at 1207 (noting that a plaintiff must plead that the manufacturer "violated a federal requirement specific to the FDA's PMA approval of th[e] Class III device" and concluding that classwide claims of generic manufacturing defects do not survive a motion to dismiss); *Bausch*, 630 F.3d at 555–56 (concluding that violations of CGMPs are not too general to be applied by a jury).

*Bass*, 669 F.3d at 511–12.

The Amended Complaint in this case does not involve a manufacturing defect, but alleges violation of "vague and open-ended" CGMPs. While New York law provides that a "violation of a State statute that imposes a specific duty constitutes negligence per se, or may even create absolute liability," *Yenem Corp. v. 281 Broadway Holdings*, 18 N.Y.3d 481, 489, 964 N.E.2d 391, 941 N.Y.S.2d 20 (2012), the CGMPs at issue—like the CGMPs at issue in *Pearsall*, *Burkett* and *Ilarraza*—do not impose specific duties. Accordingly, state-law claims premised on a violation of these CGMPs have the potential to create "varying standards that would be 'different from, or in addition to' those required by the federal scheme, and are therefore preempted." *See Pearsall*, 147 F.Supp.3d at 197; *Ilarraza*, 677 F.Supp.2d at 588.

██ Even if violations of these CGMPs could give rise to a parallel claim, the Court would grant summary judgment to Defendant because Plaintiff has not established that Defendant violated a CGMP

requirement or that said violation resulted in his injury. There is no evidence that Medtronic violated 21 C.F.R. § 820,198 by failing to receive, review, evaluate and investigate Plaintiff's complaint. The only evidence which Plaintiff has adduced in support of this claim is a Form FDA 3500A, which is attached to the Hoshovsky Declaration as Exhibit K. This form reflects that Medtronic did not report the February 23, 2007, incident involving Plaintiff to the FDA until April 21, 2010. However, Plaintiff did not commence this action until February 23, 2010, and there is no evidence that Plaintiff complained, or that Defendant otherwise learned of Plaintiff's fracture, prior to that date. Furthermore, even if Medtronic somehow violated the dictates of 21 C.F.R. § 820,198, there is no link between that violation and Plaintiff's injury.

In addition, Plaintiff has not adduced admissible evidence to establish that Defendant violated 21 C.F.R. § 820,170(b), which provides that "[t]he person installing the device shall ensure that the installation, inspection, and any required testing are performed in accordance with the manufacturer's instructions and procedures and shall document the inspection and any test results to demonstrate proper installation." Dr. Kreizman and Dr. Gasalberti were the "person[s] installing the device," not Medtronic. These physicians made the decisions regarding whether Plaintiff was a good candidate for the neurostimulator trial; what anesthesia to use; how to ensure that Plaintiff was capable of participating in intraoperative testing of the System; how to ensure that the Leads were placed correctly; and how to document the placement of the Leads and Plaintiff's response to the testing. While Baker may have been present at the time some of these decisions were made, there is no evidence that he was consulted with respect to any of these issues.

Furthermore, there is no evidence that the doctors or anyone else failed to follow Medtronic's detailed installation and testing instructions and procedures. First, there is no evidence that Plaintiff was not a good candidate for the neurostimulator trial. At his deposition, Plaintiff testified that two physicians had independently recommended the trial: first, Dr. Mogliner and then Dr. Kreizman. Dr. Kreizman had been treating Plaintiff regularly for 17 months at the time he made his recommendation, and can be presumed to know Plaintiff's abilities and limitations. In addition, Plaintiff sought a second opinion from a Dr. Fuzalov, whom Plaintiff describes as "a pain management doctor [who]... knows best." Babayev Deposition, p. 44. According to Plaintiff, Dr. Fuzalov also thought the trial was a good idea.

Second, there is no evidence that a general anesthesia was used during the implantation of the Leads. To the contrary, Dr. Kreizman's Operative Report, which is attached to the Hoshovsky Declaration as Exhibit I, states that Plaintiff was "sedated by [an] anesthesiologist" provided by the hospital, and that "Lidocaine was injected at the L2 to L3 level to provide local anesthesia."

Plaintiff does not have personal knowledge of facts contradicting Dr. Kreizman's report. Plaintiff was certain that he received "something" (Babayev Deposition, pp. 55, 60), but expressed uncertainty regarding what it was. At first, he testified, "I believe I had some ... local anesthesia" (id., p. 91), before equivocating and stating, "probably it was not local anesthesia." (Id.). Even if Plaintiff had testified unequivocally, his testimony regarding whether the anesthesiologist used a general anesthetic or local anesthetic plus sedation would be inadmissible hearsay.

Regardless of what anesthetic was used, there is no evidence that Plaintiff was not

awake and able to provide feedback during the intraoperative testing of the System. Both Dr. Kreizman and Baker testified at their depositions that Plaintiff was awakened in the operating room and participated in the testing of the System. Dr. Kreizman-specifically recalled that Baker conducted the testing in his presence, and that Plaintiff stated that he "felt good." (Kreizman Deposition, pp. 79–80). Baker testified that he spoke to Plaintiff in the operating room, and that his usual practice is to "confirm that the stimulation is in the right place" before the patient is removed to the recovery room. (Baker Deposition, p. 42).

Plaintiff not only offers no evidence to contradict this testimony, but corroborates it. At his deposition, Plaintiff testified that the first thing he remembered after surgery was "some person next to [him]," "doing some adjustments" with "some kind of equipment." (Babayev Deposition, p. 57). According to Plaintiff, the person asked him about his condition, inquiring about how he felt and what he felt. (Id.). Plaintiff identified the person as a "technician" or "Representative," and thought that he was Baker, the same technician or representative with whom he had spoken in Dr. Kreizman's office. (Id., pp. 58–59, 118–19).

Third, Plaintiff has not adduced any evidence to establish that the procedures for documenting the testing and the positioning of the Leads were not followed. In describing the manner is which the implantation surgery is generally conducted, Dr. Gasalberti testified that multiple fluoroscopic images are taken to make sure the Leads are in the correct position and that a patient's answers during intraoperative testing are "all recorded, as well as … whether the leads are in [the] proper place." (Gasalberti Deposition, p. 19). Dr. Gasalberti recalled that Plaintiff's procedure was "done on a routine basis" and "was performed in a perfect manner" (id.,

p. 17), implying that procedures for documenting the testing and the positioning of the Leads were followed. Plaintiff has introduced no evidence to the contrary.

Even assuming, arguendo, that these procedures were not followed and that Defendant was responsible for the omissions, there is no evidence that the failure to follow these procedures caused Plaintiff's injury. This record-keeping was important because the Percutaneous Leads are removed and the external neurostimulator is replaced at the end of the trial. Accurate records enable medical personnel who subsequently implant the permanent System to replicate the parameter settings and Lead positions that have proved effective during the trial. However, since the trial was a failure, permanent Leads were never implanted. The failure to keep accurate records did not contribute in any way to the injury at issue, which allegedly occurred almost immediately after the surgery to implant the Percutaneous Leads.

Finally, there is no evidence that the unexpected stimulation resulted from Baker's failure to properly train Plaintiff regarding the operation of the System or to decrease the amplitude to zero volts before handing the ENS to Plaintiff. First, Plaintiff testified that he experienced the shock immediately after plugging the Connector into the ENS. (Babayev Deposition, p. 92). He immediately disconnected the System and did not operate it again. Accordingly, there is no evidence that the shock resulted from Plaintiff's operation of the System.

Second, there is no evidence that the shock resulted from the failure to reduce the amplitude to zero before plugging the Connector into the ENS. The failure to reduce the amplitude is only one of several known, potential causes of the "jolting or shocking sensation" which Plaintiff allegedly experienced. For example, the Manual states that "strong sources" of

electromagnetic interference can result in unexpected changes in stimulation. (Hoshovsky Declaration, Ex. H, p. 24). EMI can be generated by ubiquitous household devices, such as cellular telephones. (*Id.*, pp. 136–37). In addition, Medtronic's Manual states that changes in posture can cause this sensation and advises patients against certain movements which would be difficult to avoid in the course of getting dressed: "reaching over your head," "turning from side to side," and "bending forward, backward, or from side to side." (*Id.*, p. 49). Indeed, the Manual notes that shocks from this cause "are most common during recovery." (*Id.*, p. 48).

Given the various known, potential causes of the shocking sensation, a jury could only speculate as to what caused the shock that Plaintiff experienced. Morever, even if Plaintiff could establish that the shock was caused by Baker's negligence, there is no evidence to substantiate the theory that the shocking incident caused Plaintiff's fracture. Medtronic's literature states that an "unexpected change in stimulation . . . does not. . . injure a patient directly," though "[i]n rare cases, as a result of the unexpected changes in stimulation, patients have fallen down and been injured." (*Id.*, pp. 24–25). However, Plaintiff himself testified that he did not fall. (Babayev Deposition, p. 123). Although Plaintiff claims that a doctor told him that his fracture resulted from a strong spasm caused by the shock, this testimony is inadmissible hearsay and Plaintiff can no longer recall the name of the doctor. (*Id.*, pp. 105–06).

### Failure to Warn

Plaintiff's fifth cause of action fails for some of the same reasons set forth above. First, to the extent that Plaintiff is alleging that Defendant failed to warn Plaintiff that the System was "adulterated," the Amended Complaint's allegations of adulteration are conclusory. Plaintiff's pleading does not allege plausible facts that even suggest the nature of the defect or adulteration. Morever, Plaintiff has failed to introduce any proof to contradict Defendant's evidence that the System components used in Plaintiff's surgery were manufactured, inspected, tested, packaged, and labeled in accordance with the premarket approval requirements. (Boodoosingh Affidavit, ¶¶ 5, 13–15 & Ex. D (Lead); Millin Affidavit, ¶¶ 3, 15 & Ex. C (Connector); Montgomery Affidavit, ¶¶ 7–8, 16–19, Exs. K & L (ENS and Programmer)).

To the extent that Plaintiff is arguing that Baker failed to warn of violations of Medtronic's own installation procedures, Plaintiff has adduced no evidence that the procedures were violated. Plaintiff's Memo specifically alleges that Baker should have known that the procedure was being performed under general anesthesia, should have warned Plaintiff that he would be unable to communicate during intraoperative testing, and should have warned Plaintiff that the amplitude was not adjusted to zero volts before leaving Plaintiff to plug the Connector into the System. Plaintiff's Memo, p. 18. However, as explained above, there is no competent evidence that a general anesthetic was used; uncontroverted evidence that Plaintiff participated in the intraoperative testing; and no evidence to establish that Baker failed to reduce the amplitude to zero.

### CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is granted and Plaintiff's cross-motion for spoliation sanctions is denied. The Clerk of Court is directed to enter judgment in favor of Defendant and to close this case.

**SO ORDERED.**